IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


DUONG THANH HO,
      Petitioner,

vs.                            Case No.: 5:16cv105/LAC/EMT

JULIE L. JONES,
      Respondent.
_____/

## ORDER AND REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus

filed pursuant to 28 U.S.C. § 2254 (ECF No. 1). Respondent filed an answer,

supplemental answer, and relevant portions of the state court record (*see* ECF Nos. 20,

24). Petitioner filed a reply and three supplements (*see* ECF Nos. 22, 25, 27, 30).

The case was referred to the undersigned for the issuance of all preliminary

orders and any recommendations to the district court regarding dispositive matters.

*See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ.

P. 72(b). After careful consideration of all issues raised by the parties, it is the

opinion of the undersigned that no evidentiary hearing is required for the disposition

of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.     BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF Nos. 20, 24).[1] Petitioner was charged in the Circuit Court for Bay County, Florida, Case No. 2009-CF-1606, with one count of principal to burglary of a structure (Count I) and one count of principal to felony criminal mischief (Count II) (Ex. A at 14).  On September 16, 2009, Petitioner and the State entered a deferred prosecution agreement ("DPA"), and Petitioner entered a pretrial intervention ("PTI") program (*id.* at 20–22).  On or about December 3, 2009, Petitioner was unsuccessfully discharged from the PTI program after being charged in Case No. 2009-CF-3413 with one count of sale of marijuana to a minor (Count I) and one count of misdemeanor possession of drug paraphernalia (Count II) (*id.* at 23, 123).  On February 24, 2010, Petitioner and the State entered a written plea agreement, pursuant to which Petitioner agreed to enter a no contest plea to the charges in both cases in exchange for a sentence of three concurrent terms of five (5)

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer and supplement (ECF Nos. 20, 24).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

years of probation on the felony counts and time served on the misdemeanor count (*id.* at 146–47). The trial court accepted the plea and sentenced Petitioner in accordance with the plea agreement on February 24, 2010 (*id.* at 158–60).

On September 29, 2011, Petitioner was arrested for home invasion armed robbery (Ex. B at 246–47). He was charged in Case No. 2011-CF-3166 with one count of burglary of an occupied dwelling while armed and with a battery or assault (Count I) and one count of attempted armed robbery (Count II) (*id.* at 302). Additionally, these new charges led to issuance of a probation violation warrant in Case Nos. 2009-CF-1606 and 2009-CF-3413 (Ex. A at 171–74). A jury trial was held in Case No. 2011-CF-3166 on January 7–8, 2013, which resulted in a verdict of guilty at to Count I (Exs. C, V).[2] Petitioner pleaded no contest to the probation violations in Case Nos. 2009-CF-1606 and 2009-CF-3413 (*see* Ex. B at 371–83). On February 18, 2013, Petitioner was sentenced to five (5) years in prison, with credit for 495 days, on each of the three felony counts in Case Nos. 2009-CF-1606 and 2009-CF-3143 (*see* Ex. B at 371–83, Ex. E). He was sentenced to twenty (20) years in prison, with credit for 509 days, in Case No. 2011-CF-3166 (*id.*). The court ordered all sentences to run concurrently (*id.*).

---

[2] Prior to jury selection, the court granted the defense motion for discharge of Count II on speedy trial grounds (Ex. B at 312–13, 340).

The trial court consolidated the cases for appeal to the Florida First District Court of Appeal ("First DCA"), Case No. 1D13-888 (*see* Ex. B at 232, Ex. G). The First DCA affirmed the judgment per curiam without written opinion on April 8, 2014, with the mandate issuing April 24, 2014 (Ex. I). <u>Ho v. State</u>, 135 So. 3d 292 (Fla. 1st DCA 2014) (Table).

While Petitioner's appeal was pending, he filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. B at 384–95). The circuit court dismissed the motion for lack of jurisdiction, without prejudice to Petitioner's filing a timely motion upon completion of the direct appeal (*id.* at 397).

On October 17, 2014, Petitioner filed a Rule 3.850 motion in the state circuit court (Ex. P at 1–11). In an order rendered November 4, 2014, the circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion within sixty (60) days (*id.* at 14). Petitioner filed a timely amended motion (*id.* at 21–32). The circuit court summarily denied the motion on January 21, 2015 (*id.* at 35–39). Petitioner appealed the decision to the First DCA, Case No. 1D15-0987 (Ex. Q). The First DCA affirmed the judgment per curiam without written

opinion on June 1, 2015, with the mandate issuing August 3, 2015 (ECF No. 1 at 26–27).  Ho v. State, 169 So. 3d 1165 (Fla. 1st DCA 2015) (Table).

On September 1, 2015, Petitioner filed another Rule 3.850 motion in the state circuit court (Ex. J at 1–13).  The circuit court dismissed the motion as impermissibly successive on September 15, 2015 (*id.* at 45–47).  Petitioner appealed the decision to the First DCA, Case No. 1D15-4733 (Ex. K).  The First DCA affirmed per curiam on January 20, 2016 (Ex. L).  Ho v. State, 214 So. 3d 669 (Fla. 1st DCA 2016) (Table). The mandate issued March 22, 2016 (Ex. O).

Petitioner filed this federal habeas action on April 10, 2016 (ECF No. 1).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

**(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

**(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established"

only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  Thaler v. Haynes, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes

during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See* <u>Panetti v. Quarterman</u>, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. <u>Williams</u>, 529 U.S. at 409; *see* <u>Holland v. Jackson</u>, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam). In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for

> ordinary error correction through appeal." Harrington, *supra*, at
> 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the

merits in state court where that adjudication "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination

of the facts" standard is implicated only to the extent the validity of the state court's

ultimate conclusion is premised on unreasonable fact finding. *See* Gill v. Mecusker,

633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause,

the federal court applies an objective test. Miller-El v. Cockrell, 537 U.S. 322, 340,

123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based

on a factual determination "will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the state court

proceeding."). Federal courts "may not characterize . . . state-court factual

determinations as unreasonable merely because we would have reached a different

conclusion in the first instance." Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269,

2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see, e.g.*, Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *See* Cave v. Sec'y for Dep't of Corr., 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision."  Gill, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review

of the merits of the petitioner's claims.  *See* <u>Panetti</u>, 551 U.S. at 954.  Even then, the

writ will not issue unless the petitioner shows that he is in custody "in violation of the

Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this

standard is difficult to meet, that is because it was meant to be."  <u>Richter</u>, 562 U.S. at

102.

III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition

that the petitioner have exhausted available state court remedies, 28 U.S.C.

§ 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct'

alleged violations of its prisoners' federal rights."  <u>Duncan v. Henry</u>, 513 U.S. 364,

365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S.

270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the

---

[3] Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted unless it appears that–
　　(A)  the applicant has exhausted the remedies available in the courts of the
State; or
　　　(B) (i)  there is an absence of available State corrective process; or
　　　　(ii)  circumstances exist that render such process ineffective to protect the
rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts
of the State, within the meaning of this section, if he has the right under the law of the State
to raise, by any available procedure, the question presented.

exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the

prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* 459

U.S. at 7 (citing <u>Sandstrom v. Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39

(1979)).  The only manner in which the habeas petitioner cited federal authority was

by referring to a state court decision in which "the defendant . . . asserted a broad

federal due process right to jury instructions that properly explain state law."

<u>Anderson</u>, 459 U.S. at 7.  The Court expressed doubt that a defendant's citation to a

state-court decision predicated solely on state law was sufficient to fairly apprise a

reviewing court of a potential federal claim merely because the defendant in the <u>cited</u>

case advanced a federal claim.  *Id.*, 459 U.S. at 7 & n.3.  Furthermore, the Court

clarified that such a citation was obviously insufficient when the record satisfied the

federal habeas court that the federal claim asserted in the cited case was not the same

as the federal claim on which federal habeas relief was sought.  *Id.*

Years later the Supreme Court readdressed the "fair presentation" requirement

in <u>Duncan v. Henry</u>, 513 U.S. 364.  The <u>Duncan</u> Court strictly construed the

exhaustion requirement so as to mandate that, if state and federal constitutional law

overlap in their applicability to a petitioner's claim, the petitioner must raise his issue

in terms of the applicable federal right in state court in order to obtain federal review

of the issue.[4]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.

In Baldwin v. Reese, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004).  The Baldwin Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  Id., 541 U.S. at 32.  With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

---

[4] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d [1277,] 1184 [(M.D. Ala. 2004)] (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[5]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. See Coleman v. Thompson, 501

---

[5] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. Id.

U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* <u>Tower v. Phillips</u>, 7 F.3d 206, 210 (11th Cir. 1993); <u>Parker v. Dugger</u>, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  <u>Bailey</u>, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id.*  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* <u>Harris v. Reed</u>, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. <u>Lee v. Kemna</u>, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6] Id. Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Id. Third, the state procedural rule must be adequate. Id. The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. Id.

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct.

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

1454, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." <u>Schlup</u>, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*  Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence.  *See* <u>McQuiggin v. Perkins,</u> — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013).  As the Court stated in <u>Schlup</u>, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]."  513 U.S. at 332; *see also* <u>House v. Bell</u>, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Within this framework, the court will review Petitioner's claims.

IV.    PETITIONER'S CLAIMS

A.    <u>Ground One:   "Trial court erred in admitting defendant's recorded statement, as the totality of the circumstances illustrate that it was not freely and voluntarily made.  This is in violation of U.S. Const. Ammend [sic] V."</u>

Petitioner contends the trial court erred by admitting his recorded statement to law enforcement officers hours after his arrest in late September 2011, on the ground that his mental illness prevented him from knowingly, intelligently, and voluntarily waiving his <u>Miranda</u>[7] rights (ECF No. 27).  Petitioner alleges at the time of his arrest, he was suffering from mental illness and had been prescribed Abilify (5 milligrams), Buspar (5 milligrams), and Lithium (300 milligrams) (*id.*).  Petitioner alleges that upon his arrest, he was not given his medications, and he was interrogated the next morning despite not having received any of his medications (*id.*).  Petitioner alleges he was not provided his medications until November 1 or 2, 2011, a month after his arrest (*id.*).  Petitioner contends that without his medications, he could not knowingly and intelligently waive his right to counsel and his right to remain silent (*id.*).  Petitioner states he presented this claim of trial court error on direct appeal of his conviction (ECF No. 1 at 5).

_____

[7] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Case No.:  5:16cv105/LAC/EMT

Respondent contends the state court adjudicated the merits of the claim, and Petitioner failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law (ECF No. 20 at 17–28).

1.     Clearly Established Federal Law

In Miranda, the Supreme Court formulated a warning that must be given to suspects before they may be subjected to custodial interrogation.  The substance of the warning is the following:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 479.  If a defendant unambiguously requests counsel or to remain silent, police must cease interrogation.  See Berghuis v. Thompkins, 560 U.S. 370, 382, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010); Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused "in fact knowingly and voluntarily waived

[Miranda] rights" when making the statement. <u>North Caroline v. Butler</u>, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). The government bears a "heavy burden" to demonstrate that the waiver was voluntary, knowing, and intelligent, *see* <u>Miranda</u>, 384 U.S. at 475, but the Supreme Court has held that this burden "is not more than the burden to establish waiver by a preponderance of the evidence." <u>Colorado v. Connelly</u>, 479 U.S. 157, 168, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

The inquiry into whether a waiver was voluntary, knowing, and intelligent is twofold, or, stated another way, "has two distinct dimensions." <u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, the waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived. *Id.*

The Supreme Court has long taken into account the personal characteristics of the defendant in determining whether his will was overborne in the giving of an

incriminating statement. One of the factors taken into account is the defendant's mental capacity. *See, e.g.*, Fikes v. State of Ala., 352 U.S. 191, 77 S. Ct. 281, 1 L. Ed. 2d 246 (1957) (less than third grade education); Culombe v. Connecticut, 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961) (mental defect). While the defendant's mental capacity is a consideration in determining voluntariness, it is "relevant only in establishing a setting in which actual coercion might have been exerted to overcome the will of the suspect." Procunier v. Atchley, 400 U.S. 446, 453–54, 91 S. Ct. 485, 27 L. Ed. 2d 524 (1971). Absent actual coercion, even a person with mental disorders or a low IQ can be found to have confessed voluntarily. *See* Connelly, 479 U.S. at 164; *see also* United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) (citing Connelly, 479 U.S. at 169–70); Coleman v. Singletary, 30 F.3d 1420, 1426 (11th Cir. 1994); Purvis v. Dugger, 932 F.2d 1413, 1422–23 (11th Cir. 1991).[8] Mental illness is also a factor to be considered in determining whether a waiver was made knowingly. *See* Miller v. Dugger, 838 F.2d 1530, 1539 (11th Cir. 1988).

---

[8] For example, in Connelly, Supreme Court upheld the murder conviction of a defendant suffering from schizophrenia who confessed to a police officer after the "voice of God" instructed him either to confess to the murder or to commit suicide. 479 U.S. at 164–67. The Court found the confession voluntary because the compulsion to confess was not accompanied by "coercive police activity." *Id.*

2.  Federal Review of State Court Decision

A suppression hearing on the issue of the admissibility of Petitioner's statement to law enforcement officers was held during Petitioner's trial, and is included in the trial transcript (Ex. V at 166–200). Investigator Jeff Haire testified that on the evening of September 29, 2011, and into the early morning hours of September 30, he obtained information relating to a burglary which led him to arrest Petitioner (Ex. C at 73–91). Investigator Haire testified that when he approached Petitioner just prior to arresting him, Petitioner was cursing, yelling, and screaming, and "very uncooperative" (*id.* at 104–05). Haire testified that, based upon his experience with persons intoxicated by controlled substances, Petitioner appeared to be intoxicated from a controlled substance (*id.*). Haire testified that he asked Petitioner whether he was on drugs, and Petitioner stated yes (*id.*). Haire testified that Petitioner was transported to a sheriff's office sub-station in Callaway, Florida (*id.* at 105–06). Investigator Haire testified that at the sub-station, he read Petitioner his <u>Miranda</u> rights, and Petitioner stated that he understood his rights and indicated he wished to waive his rights and speak to Haire (*id.* at 106, 126–27). Haire testified that he began to interview Petitioner, but because Petitioner appeared to be on a controlled substance and admitted that he had smoked marijuana, Haire decided to stop the interview and have Petitioner transported

to the jail (*id.* at 106, 127).  Investigator Haire testified that Petitioner was booked into

the jail (*id.*).

Investigator Haire testified that he returned to the jail to interview Petitioner

later that morning, between 10:20–10:30 a.m., after several hours had passed since

Petitioner's arrest (Ex. C at 107, 128; Ex. V at 177–85).  Investigator Haire testified

that Petitioner's demeanor was "completely different" in that Petitioner was calm and

"had a totally different attitude" (Ex. V at 177–85).  Investigator Haire testified that

he spoke with Petitioner, with Investigator Llorenz in the room, for 10–15 minutes

prior to taking Petitioner's recorded statement.

Haire testified that before he interviewed Petitioner, he read Petitioner the

following advisory from a pre-printed form:

> Before we ask you any questions you must understand your rights.  You
> have the right to remain silent.  Anything you say can be used against
> you in court.  You have the right to talk to a lawyer for advice before we
> ask you any questions and have him or her present during questioning,
> if you wish.  If you cannot afford a lawyer, one will be appointed for you
> before any questioning, if you wish.  If you decide to answer questions
> now without a lawyer present, you will still have the right to stop
> answering at any time.  You also have the right to stop answering at any
> time until you talk to a lawyer.

(Ex. C at 118–19).  Investigator Haire testified that the pre-printed form included the

following "waiver of rights" section at the bottom, which he also read to Petitioner:

> I have read this statement of my rights. I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

(Ex. C at 119). Investigator Haire testified that Petitioner signed the form in the presence of Haire and Investigator Llorenz, and the form was time stamped as 10:26 a.m. (*id.* at 119, 124, 130).

Investigator Haire testified that he did not threaten or trick Petitioner in any way, nor did he promise Petitioner anything in exchange for making a statement (Ex. C at 118–19, 128). Haire testified that Investigator Llorenz did not threaten Petitioner in any way (*id.* at 128). Investigator Haire testified that Petitioner appeared to understand what was going on (*id.*). Haire testified that Petitioner acknowledged his rights and agreed to waive them, both verbally and in writing (*id.* at 128–30). Haire testified that he then took a recorded statement from Petitioner, which began at 10:42 a.m. (*id.* at 119–20, 124).

Investigator Haire testified that during the time he was with Petitioner, Petitioner never asked for any medicine, and he (Haire) never denied Petitioner any medicine (Ex. V at 177–85). Haire testified that he did not recall that Petitioner requested water or indicated a desire for water; and he (Haire) did not deny Petitioner

access to water. Investigator Haire testified that Petitioner did not urinate in a cup. Haire testified that there was a restroom within twenty feet of the interview room, and he never denied Petitioner access to it. Investigator Haire testified that at the time he interviewed Petitioner, he (Haire) was not aware that Petitioner had a brother. Haire testified that he never threatened Petitioner's brother or any other member of Petitioner's family; and he never told Petitioner that he would arrest Petitioner's brother if Petitioner did not confess. Investigator Haire testified that he never told Petitioner that the victim was in the hospital dying, nor did he tell Petitioner that he would be charged with capital murder if he did not confess. Haire testified that he never told Petitioner that he needed to say he was sorry, or that it would be better for Petitioner if he said he was sorry. Investigator Haire reiterated that he began Petitioner's recorded statement at 10:42 a.m. and noted that he concluded it at 11:04 a.m. Haire testified that according to jail records, Petitioner was transported to the interview room at 10:19 a.m.

Derrick Swain, a lieutenant with the Bay County Sheriff's Office, testified that he was employed in the jail's master control room, which controls the movement of inmates to and from different locations within the jail (Ex. V at 187–96). Lieutenant Swain testified that according the inmate movement sheet for September 30, 2011,

Petitioner left his cell at 10:19 a.m. and returned to his cell at 11:14 a.m. The inmate movement sheet was admitted into evidence at the suppression hearing.

Mr. A.C. Llorenz, who was employed as an investigator with the Bay County Sheriff's Office on September 30, 2011, also testified at the suppression hearing (Ex. V at 167–75). Investigator Llorenz testified that he and Investigator Haire spoke with Petitioner at approximately 10:00 a.m. on September 30, 2011. Investigator Llorenz testified that he and Investigator Haire were in the interview room with Petitioner for approximately 15 minutes prior to Petitioner's providing a recorded statement. Llorenz testified that Haire did most of the questioning, and he (Llorenz) did not recall saying anything during the questioning. Investigator Llorenz testified that at no time did Investigator Haire ever threaten Petitioner. Llorenz testified that at no time did he (Llorenz) makes threats regarding Petitioner's brother; in fact, Llorenz testified that he did not know that Petitioner had a brother until the morning of trial (fifteen months after Petitioner's arrest and interview). Investigator Llorenz testified that he never threatened to charge Petitioner with capital murder if he did not apologize. Llorenz testified that he never told Petitioner that the victim of the burglary was in the hospital and may die. Investigator Llorenz testified that he never forced Petitioner to urinate in a cup, and he never denied Petitioner access to a bathroom or drinking water.

Llorenz testified that Petitioner never asked him for medication, and Llorenz never denied Petitioner access to medication. When questioned about Petitioner's demeanor, Investigator Llorenz testified that Petitioner appeared to be calm and cooperative. Llorenz testified that Petitioner did not appear disoriented or confused. Llorenz testified that he never told Petitioner that he needed to apologize or admit the crime. Investigator Llorenz testified that he never "fed" Petitioner information or told him what he needed to say. Llorenz testified that Petitioner was forthcoming with information about the case. Investigator Llorenz testified that he was present when Investigator Haire read Petitioner the <u>Miranda</u> rights waiver form, and he was present when Petitioner signed the form. The waiver form was admitted into evidence at the suppression hearing. Investigator Llorenz testified that Petitioner freely and voluntarily signed the waiver form, and Llorenz did not force Petitioner to sign it. Investigator Llorenz testified that he left the room while Investigator Haire took Petitioner's recorded statement. Llorenz testified that Petitioner's recorded statement took approximately five minutes, and then he and Investigator Haire left the jail.

Petitioner testified during the suppression hearing (Ex. C at 132–43). Petitioner testified that he had been diagnosed with psychotic disorder, general anxiety disorder, ADHD, and "some other stuff" (*id.* at 132). Petitioner testified that he was taking

Buspar, Seroquel, lithium, and "some other stuff" to treat his mental disorders (*id.* at 133). Petitioner testified that he had not taken his medication on the day he was arrested (*id.*). He testified that when he does not take his medication, he begins to experience symptoms of his mental illness within 2–4 hours (*id.* at 134). Petitioner testified that when he was first taken to the Callaway sub-station after his arrest, he remembered that the officers said something about a lawyer (*id.*). Petitioner testified he told the officers that he wanted to talk to a lawyer, and that he was going to "use" his right to remain silent (*id.* at 134–35). Petitioner testified that the officers responded, "It doesn't matter, it doesn't change the facts; you still did what you did." (*id.* at 135). Petitioner testified that he told the interrogating officers that he needed his medicine, but the officers told him that he could not have it until he was done talking to them (*id.* at 133). When asked how long he was interrogated at the sub-station, prior to being taken to the jail, Petitioner testified, "Hours. It was a long time. Enough to make me want to use the bathroom and be thirsty." (*id.* at 135). Petitioner testified that when he was booked into the jail, he was not taken to a cell, rather, he was placed in an interview room and left there for "hours" (*id.* at 135–36). Petitioner testified that he asked for water and food, but "they" said "people here don't deserve it" (*id.* at 135, 139). Petitioner testified he told Investigator Llorenz that he needed to

use the bathroom, and Llorenz responded, "It doesn't matter." (*id.* at 136, 139).

Petitioner testified he urinated in a cup (*id.*). Petitioner testified he was not given his

medicine while he was at the jail (*id.* at 136, 139). Petitioner testified he spoke with

the officers for "hours" prior to his recorded statement (*id.*). He testified that the

investigators told him that the victim "could possibly be in the hospital because the

robbery went bad and if she dies, I'm going to get capital murder" (*id.* at 137). When

Petitioner was asked whether he asked the officers for an attorney at any time while

he was at the sub-station or the jail, Petitioner responded, "Every time. . . . I asked for

an attorney. I don't have to speak to you unless I want to." (*id.*). Petitioner was

shown the written <u>Miranda</u> form, and testified that the signature on the form was not

his (*id.* at 143).

On cross-examination by the State, Petitioner testified that the officers told him

to make up a story (Ex. C at 139). Petitioner testified that Investigator Haire promised

that if Petitioner said he was sorry for the burglary, he would get Petitioner a good

deal, and Petitioner would not get life in prison (*id.* at 142). Petitioner testified that

Haire also threatened Petitioner with his little brother, saying "We have got your little

brother." (*id.*). Petitioner testified that the audio recorder was not on when Haire

threatened him (*id.*).

An audio recording of Petitioner's statement to Investigator Haire was published to the trial court during the suppression hearing, and its transcription is included in the trial transcript (Ex. C at 147–61).

At the conclusion of the suppression hearing, the court ruled as follows:

> I am going to find from the preponderance of the evidence from what I have heard that the statement was freely and voluntarily made; there were no threats or promises made against the Defendant; that his comment that he was in there for multiple hours was disproved by the jail records. The other comments that he made that he was refused food, medicine and access to toilet facilities is something for the jury to decide, how much weight to be given, but it's not for me to judge at this point. Therefore, I do think the State has carried its burden and therefore the statement is admissible. I cannot find that he was, based on all I have heard, his familiarity with the process, too, the testimony that he was calm, even he says he was not taking any drugs, the officers say—well, Investigator Haire says he was, he felt he was under the influence earlier in the morning therefore he did not question him. That does not necessarily help the State so I tend to find that more believable than his comment that he was not using anything, did not make a lot of sense [sic], so therefore it will be admissible.

(Ex. V at 199–200).

On direct appeal of his conviction, Petitioner argued that the trial court erred by admitting his recorded statement to Investigator Haire, because the totality of the circumstances showed that Petitioner's mental illness and lack of prescribed medication rendered him unable to freely and voluntarily waive his Miranda rights (Ex. H at 29–37). Petitioner argued that, based upon competency evaluations

performed in December 2, 2011, and March 12, 2012, the trial court determined

Petitioner was incompetent to proceed, and committed him to the custody of the

Florida Department of Children and Families (Ex. H at 31–32; *see also* Ex. B at

259–66, 274–77, 282–85).  Petitioner argued that although the court ultimately found

him competent to proceed, on August 26, 2012, the finding was made after Petitioner

had been properly administered necessary prescriptions to treat his mental illness (Ex.

H at 31–32; *see also* Exs. S-1, S-2).  Petitioner further argued that a sharp contrast

existed between his speech at the time of his statement to Investigator Haire and his

speech during the suppression hearing and trial (Ex. H at 32–33).  Petitioner asserted

that at the time of his statement, his speech was marked by delusion, disorganization,

divergent thought, facts wholly unsupported by evidence, and contradictory

statements (*id.* at 33).  Petitioner argued that by contrast, his speech at trial was "rather

measured" (*id.* at 32).

The First DCA affirmed Petitioner's conviction and sentence without written

opinion (Ex. I).

"[T]he summary nature of a state court's decision does not lessen the deference

that it is due."  Wright v. Moore, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also*

Harrington, 562 U.S. at 99 ("When a federal claim has been presented to a state court

and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision. *See* <u>Harrington</u>, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* <u>Harrington</u>, 562 U.S. at 102; *see also* <u>Gill</u>, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The First DCA's rejection of Petitioner's claim could have been based upon the theory that the totality of the circumstances indicated that Petitioner's waiver of his <u>Miranda</u> rights and his subsequent statements to Investigator Haire were knowing and voluntary.

The trial court found as fact that the investigators did not threaten Petitioner or promise him anything to induce him to make a statement. Although the investigators and Petitioner offered completely different testimony on these issues, the trial court credited the investigators' testimony and discredited Petitioner's. The court also discredited Petitioner's testimony that the questioning lasted for multiple hours.

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); see also Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006)). Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983); see also Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998); Smith v. Kemp, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair

hearing."). Questions of the credibility and demeanor of a witness are questions of fact. *See* Consalvo, *supra* (citation omitted). "The deference compelled by the AEDPA requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations." Nejad v. Attorney, 830 F.3d 1280, 1292 (11th Cir. 2016) (internal quotation marks and citation omitted). Instead, "[i]n the absence of clear and convincing evidence, [courts] have no power on federal habeas review to revisit the state court's credibility determinations." *Id.* (emphasis in original) (citation omitted).

Here, Petitioner failed to present clear and convincing evidence to rebut the state court's findings that Petitioner's waiver of his Miranda rights was not the product of threats or promises by law enforcement. In the absence of any evidence of coercion by Investigators Haire and Llorenz, the state court reasonably concluded that Petitioner's waiver was voluntary.[9]

---

[9] At the time of Petitioner's trial, in January of 2013, the trial court was aware of the observations of the competency evaluator, who evaluated Petitioner's mental status and issued a report on August 8, 2012, opining that Petitioner was "*competent but unwilling to proceed*" (Ex. S-1) (emphasis in original). One of the recommendations of the evaluator, Dr. May Tay, was the following:

> Mr. Ho is likely to present as highly symptomatic, with ostensible memory impairments, thought-disorder, and disorientation, while in the jail and particularly during any future court-ordered competency evaluations. It is recommended that the appointed community-based evaluator be furnished with a copy of this report prior to seeing Mr. Ho, and that individuals evaluating him maintain a high index of suspicion for malingering. Absent significant convincing evidence to the contrary,

The remaining issue is whether the state court reasonably rejected Petitioner's argument that his <u>Miranda</u> waiver was unknowing due to his mental condition. As previously discussed, the waiver must be made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. Here, Petitioner did not dispute that Investigator Haire read him his <u>Miranda</u> rights from the pre-printed form, thus notifying him that he had the right to remain silent and the right to counsel. Further, Petitioner's testimony that he actively asserted his rights by telling the investigators he wanted to speak with an attorney and to exercise his right to remain silent (which the trial court discredited) demonstrates that Petitioner understood his <u>Miranda</u> rights.

Additional evidence adduced at the suppression hearing suggested that Petitioner's <u>Miranda</u> waiver was knowing and voluntary. Investigator Haire testified that Petitioner was calm during the interview. Further, the transcript of Petitioner's recorded statement indicates that Petitioner was generally responsive during the interview, and he understood the questions put to him (Ex. C at 147–61). Petitioner readily stated his name, address, date of birth, and telephone number. Petitioner

---

any acting out, medication refusal, refusal to respond to questions, severe confusion, and/or forgetfulness that Mr. Ho displays in the jail or in the courtroom should be considered willful, volitional, and deceptive.

(Ex. S-1).

Case No.: 5:16cv105/LAC/EMT

acknowledged that his <u>Miranda</u> rights were read to him and that he signed a form stating he wished to speak with investigators without a lawyer present.  Petitioner stated that he was speaking with investigators because he wanted to "do the right thing," apologize to the victims, and get his life back in order.  Petitioner's description of how he twice went to the door of the victim's house—the first time, simply stating, "Wrong house" and leaving after the victim answered the door, and the second time, kicking open the door open, entering the house demanding money, and then running out of the house after the victim—was consistent with the victim's description of Petitioner's conduct.  Additionally, Petitioner's description of going to and from the victim's neighborhood in a car driven by Kellie Weisensale and another passenger was consistent with what Kellie Weisensale and Tanisha Thomas told the investigators.  Although Petitioner expressed confusion when investigators questioned him about certain specifics of the robbery (i.e., whether he was wore a mask, what weapons he was carrying, and what he did with the weapon(s)), Petitioner told investigators he could not remember some of those details because he was under the influence of drugs at the time he committed the burglary.

Petitioner failed to demonstrate that the First DCA's rejection of his claim of trial court error, with respect to admission of his statement to investigators, was

contrary to or an unreasonable application of Supreme Court precedent. Therefore, Petitioner is not entitled to federal habeas relief on Ground One. *See, e.g.*, <u>Oats v. Singletary</u>, 141 F.3d 1018, 1027 n.23 (11th Cir. 1998) (affirming district court's denial of habeas relief on petitioner's claim that trial court erred in denying motion to suppress his confessions because he lacked the mental capacity to intelligently and voluntarily waive his <u>Miranda</u> rights, where interrogating officers did not promise leniency and made no statements that would render petitioner's confessions involuntary); <u>Moore v. Dugger</u>, 856 F.2d 129, 134–35 (11th Cir. 1988) (affirming district court's denial of habeas relief on petitioner's claim that his mental limitations rendered his waiver of <u>Miranda</u> rights unknowing and unintelligent).

> B.      <u>Ground Two: "Trial court erred in denying defendant's motion for a misstrial [sic], as comment on defendant's recorded statement as a 'confession' no doubt had a harmful effect on the jury, in violation of U.S. Const. Ammend. [sic] V."</u>

Petitioner claims that the trial court violated his due process rights by denying defense counsel's request for a mistrial after Investigator Haire referred to Petitioner's statement to investigators as a "confession" (ECF No. 1 at 6). Petitioner asserts he presented this claim to the state courts on direct appeal (ECF No. 1 at 6).

Respondent contends the state court adjudicated the merits of the claim, and Petitioner failed to demonstrate that the state court's decision was contrary to, or

involved an unreasonable application of, clearly established federal law (ECF No. 20 at 28–32).

       1.     Clearly Established Federal Law

In federal criminal trials, a trial court should grant a mistrial based on improper testimony only if there is a reasonable probability that the testimony altered the outcome of the case. *See* United States v. Emmanuel, 565 F.3d 1324, 1334 (11th Cir. 2009). "Determinations of the impact of allegedly prejudicial testimony upon a jury, as well as what curative measures, if any, can be taken to negate the harmful effects, are matters within the sound discretion of the trial judge." United States v. Rodriguez-Arevalo, 734 F.2d 612, 615 (11th Cir. 1984); *see also* United States v. Johnson, 713 F.2d 654, 659 (11th Cir. 1983). Prejudicial testimony is less likely to mandate a mistrial "when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury." Rodriguez-Arevalo, 734 F.2d at 615; *see also* United States v. Rojas, 537 F.2d 216, 222 (5th Cir. 1976).

Under Florida law, "[a] ruling on a motion for a mistrial is within the sound discretion of the trial court and should be 'granted only when it is necessary to ensure

that the defendant receives a fair trial.'" <u>Gore v. State</u>, 784 So.2d 418, 427 (Fla. 2001)

(quoting <u>Goodwin v. State</u>, 751 So.2d 537, 547 (Fla. 1999)).

  2. Federal Review of State Court Decision

  Petitioner presented this claim of trial court error as Issue II on direct appeal of

his conviction (Ex. H at 38–39).  He argued that Investigator Haire's trial testimony

characterizing Petitioner's statement as a "confession" deprived Petitioner of a fair

and impartial trial (*id.*).

  The relevant portion of the trial transcript reflects that during defense counsel's

cross-examination of Investigator Haire, the following transpired:

  Q [by defense counsel].  After collecting those items from Mr. Ho's room, you closed your case?

  A [by Investigator Haire].  Well, he was already arrested prior to that.

  Q.  But the case was closed—

  A.  The case wasn't closed yet but this case is not based on exactly just the back pack.  He was arrested prior to even going over there.

  Q.  Okay.

  A.  Based on statements, based on, you know, this vehicle—

  Q.  Okay.  Um, after Mr. Ho—

  A.  —and a confession.

Case No.:  5:16cv105/LAC/EMT

Q.  After—Your Honor, may we approach?

THE COURT:  Yes.

(Side-bar conference:)

MR. CARLISLE [defense counsel]:  Judge, at this point I am moving for a mistrial.  It's been referred to as a confession.  He was not to discuss, per the judge's order, to talk about any of this stuff, and it's not even determined if the alleged confession is going to be admissible at this point.

THE COURT:  The problem is I don't know why you are asking him all these questions, frankly; and I don't know why you [the prosecutor] didn't object.  What do you have to say?

MS. HAWKINS [a prosecutor]:  Well, Your Honor, he elicited, I mean, he asked him so he posed it "after this".  We instructed this witness about not mentioning confession and was going to bring him back later and he said—

THE COURT:  Well, I don't know why—Wait a minute, let's take the jury out. . . . .

(Jury directed to jury room)

THE COURT:  All right, let's talk further.  Did the State tell the witness not to say anything about the, quote, confession, unquote?

MS. HAWKINS:  Yes, Your Honor.  What I instructed the witness was that we were going to go through this investigation and stop up to where he arrested him and then we were going to take up matters that we had discussed and I told him that there may be a potential motion to suppress and that we would be discussing that and then I would be recalling him as a witness to go into it further after that was completed.

THE COURT: Okay. And you, Mr. Carlisle, were pushing him for some reason about why he arrested him and what he had at that point and things of that sort, which I don't really think is appropriate but no one objected frankly. But I am a little concerned about you opening the door to the response, on one hand. On the other hand all of that was way beyond the scope of the direct, none of which the State objected to. So here we are. So what would you like to say?

MR. CARLISLE: I believe the question preceded him letting that information in was "After collecting the items from Mr. Ho's room, you closed your case?" And I believe based on his testimony that he gathered information from Mr. Ho at the jail. I didn't go into any of the contents of the statement, knowing that we were going to go into that later. I just asked if he closed the case after he collected evidence.
. . . .
[The court reporter read back the questions and answers.]

THE COURT: So it was something that the witness decided to volunteer, seems to me?

MS. DIVINEY [a prosecutor]: Well, it looks like there were two attempts on Mr. Carlisle's part to elicit that he had closed the case. First, it was: You had already closed that the case? He answered that question; and he said: But you had already closed case?

THE COURT: I don't even know what that means "closed your case" frankly but . . .

MS. HAWKINS: Your Honor, I suggest that we just go ahead and do the suppression hearing right now, that portion, and we could elicit the questions necessary for Your Honor to decide on if the confession comes in or not because the only way this is even relevant is if you deem the confession is inadmissible.

THE COURT: Well, I think it's, I think relevancy isn't the question. The question's [sic] is, is it an inappropriate comment, that it

goes to the level that a mistrial is warranted and if the statement is not admissible then I agree then there would have to be a mistrial.  I was thinking that perhaps I should, we can go ahead and do that now, or we can take it under advisement and do it in the normal course of events, but I think it was a little truncated by stopping it and then allowing him to go forward asking him more questions, what was going on, without objecting, which probably might have been a better process but shall we do that to see . . . I think if the statement is admissible, I don't think the word "confession" should ever be used in front of a jury, Officer, but I think perhaps we should go ahead and do that now or do that shortly. Whatever way you want to do it.

MS. HAWKINS:  I would think we could go ahead and do it now, if that's all right .

THE COURT:  Let's do that and see whether that's going to be admissible.

(Ex. C at 113–17).  The court conducted the suppression hearing with regard to the

admissibility of Petitioner's statement to investigators, at the conclusion of which the

court determined that the statement was admissible (Ex. V at 199–200).

Following the court's ruling, the court re-visited defense counsel's motion for

mistrial:

[THE COURT:]  Now since it's admissible, where we started all this, was when Investigator Haire uttered the word "confession" in front of the jury.  What do you wish to say about that, on your motion for mistrial?

MR. CARLISLE:  The word "confession" obviously is prejudicial in itself.  That would be a determination that the jury makes, whether it's a confession or not and stand by our motion for mistrial.

THE COURT: Okay. I think the, since the statement is, if the statement had been inadmissible then I would have granted your motion for mistrial because it would have been an inappropriate comment. It was an inappropriate comment in any event but I can understand to some extent because you seemed to have been pushing him to say he decided, decided abruptly to charge him, so that led him to make that remark which was unfortunate. But I don't know that it rises to the level that a mistrial is required. I will, and am prepared to give a cautionary instruction to the jury, if you request.

MR. CARLISLE: Yes, ma'am, we would like it.

THE COURT: What would you like for me to say, just to ignore the comment about the confession?

MR. CARLISLE: Please.

THE COURT: Okay, I will just say: Members of the jury, you heard—okay, if you want me to say that, I will.

MR. CARLISLE: I would.

THE COURT: Be glad to.

. . . .

THE COURT: I want to make one comment to you. One of the last things you heard before we sent you out was a comment about a confession. You are to totally disregard that comment, the word "confession", please. You may continue on your cross examination.

MR. CARLISLE: Thank you, Your Honor.

(Ex. V at 200–03).

The First DCA's rejection of Petitioner's claim of trial court error, with respect to denying the motion for mistrial, could have been based upon the theory that

Investigator's Haire's use of the term "confession" did not deprive Petitioner of a fair trial. Petitioner's statement to investigators was admitted into evidence and published to the jury. In Petitioner's statement, he admitted to investigators that he twice went to the door of the victim's house—the first time, he stated "Wrong house," and left after the victim answered the door; and the second time, he kicked the door open, entered the house demanding money, and then ran out after the victim. Petitioner's admissions were consistent with the victim's testimony. Additionally, Petitioner admitted he arrived at and left the victim's neighborhood in a car driven by Kellie Weisensale and another passenger, which was consistent with the testimony of Kellie Weisensale and Tanisha Thomas, both of whom knew Petitioner prior to the burglary.

Moreover, the trial court instructed the jury to disregard Investigator Haire's characterization of Petitioner's statement to investigators as a "confession." Jurors are presumed to follow the court's instructions. *See e.g.*, Ingram v. Zant, 26 F.3d 1047, 1053 (11th Cir. 1994) ("Because we presume that jurors follow such instructions, we must assume that the jury put aside any biases it may have had, applied the legal standards as enunciated in the jury instructions, and based its sentencing decision on the facts introduced at trial and sentencing."); Raulerson v.

Wainwright, 753 F.2d 869, 876 (11th Cir. 1985) ("Jurors are presumed to follow the law as they are instructed.").

Petitioner failed to demonstrate that the First DCA's adjudication of the claim of trial court error was contrary to or an unreasonable application of clearly established federal law.  Therefore, he is not entitled to relief on Ground Two.

C.    Ground Three:  "Ineffective assistance of counsel where counsel failed to adequately prepare or represent defendant at the plea colloquy in violation of U.S. Const. Ammend. [sic] VI."

Petitioner claims that his trial counsel was ineffective for failing to adequately represent him at a pre-trial hearing on November 21, 2012, during which the State made a plea offer (ECF No. 22 at 2–12; ECF No. 25 at 1–9; ECF No. 30-1 at 1–9). Petitioner alleges defense counsel advised the court that Petitioner did not feel mentally stable enough to consider the State's plea offer, because Petitioner had not taken his medication that morning, even though the State was unwilling to extend the offer beyond the date of the hearing (*id.*).  Petitioner contends both defense counsel and the trial court were aware, from the reports of the three competency evaluators, that Petitioner's compliance with his medication regimen was essential to his mental stability (*id.*).  Petitioner contends the fact that he had not taken his prescribed medication on the morning of the pre-trial hearing provided a basis for defense

counsel to initiate proceedings to determine whether Petitioner was competent to proceed, which would have preserved the plea offer until Petitioner was competent (*id.*). Petitioner contends counsel's performance deprived him of a plea deal and forced him to proceed to trial even though he was incompetent (*id.*).

Respondent asserts Petitioner's claim is similar to one of the claims presented in Petitioner's amended Rule 3.850 motion filed on December 24, 2014 (ECF No. 24 at 2, 5, 8). Respondent states that in that motion, Petitioner alleged that his trial counsel was ineffective for not anticipating that the State would extend a plea offer to him at a pre-trial conference on November 21, 2012, and for not reminding Petitioner to take his medication so he could think clearly at the hearing (*id.*). Respondent contends the state circuit court adjudicated the merits of that claim, and Petitioner has not shown that the adjudication was contrary to or an unreasonable application of clearly established federal law (*id.* at 2, 5, 8–11). Respondent notes, however, that much of Petitioner's argument on appeal of the circuit court's decision went beyond the scope of the claim presented in his amended Rule 3.850 motion (*id.* at 5). Respondent contends any issues or arguments that Petitioner presented on appeal other than the issue and argument presented in his amended Rule 3.850 motion

were not cognizable on appeal due to Petitioner's failure to properly assert them in the circuit court (*id.* at 5–6).

1.    Clearly Established Federal Law

A defendant's Sixth Amendment right to counsel extends to the plea-bargaining process. *See* Lafler v. Cooper, 566 U.S. 156, 162–63, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012) (citing Missouri v. Frye, 566 U.S. 133, 145, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012), and McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)).  "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." Lafler, 132 S. Ct. at 1387.  The two-part test articulated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) applies to claims that counsel was ineffective during the plea process. Lafler, 132 S. Ct. at 1384 (applying Strickland's two-part test to federal habeas petitioner's claim that counsel was ineffective for advising him to reject a plea offer); Frye, 132 S. Ct. at 1404, 1409–10 (applying Strickland's two-part test to federal habeas petitioner's claim that counsel was ineffective for failing to communicate a prosecution plea offer before it lapsed); Hill v. Lockhart, 474 U.S. 52, 48, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (applying Strickland's two-part test to defendant's challenge to his guilty plea based on ineffective assistance of counsel).

Strickland's first prong requires a defendant to show "'that counsel's representation fell below an objective standard of reasonableness.'" Hill, 474 U.S. at 57 (quoting Strickland, 466 U.S. at 688). The focus of inquiry under the performance prong of the Strickland standard is whether counsel's assistance was "reasonable considering all the circumstances." Strickland, 466 U.S. at 691. In a plea situation, counsel must provide advice "within the range of competence demanded of attorneys in criminal cases." Hill, 474 U.S. at 56–57 (quoting McMann, 397 U.S. at 771). Under this standard, representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused. Stano v. Dugger, 921 F.2d 1125, 1150–51 (11th Cir. 1991). Absent such blatant errors, however, the court should "indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990).

Strickland's second prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of pleas, "[t]he . . . 'prejudice' requirement . . . focuses on whether counsel's

constitutionally ineffective performance affected the outcome of the plea process."

Hill, 474 U.S. at 59.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Richter, 131 S. Ct. at 788. As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. (citations omitted).

2.    Federal Review of State Court Decision

As Ground One of Petitioner's amended Rule 3.850 motion, Petitioner argued

that defense counsel should have anticipated that the State would make a plea offer

at the pre-trial hearing on November 21, 2012, and defense counsel should have

advised Petitioner to prepare himself by taking his medication prior to the hearing (Ex.

P at 25–27). Petitioner claimed that if defense counsel had advised him to prepare for

a plea offer by taking his medication, he would have accepted the State's one-time

offer of seven (7) years, instead of proceeding to trial and receiving a 20-year sentence

(*id.*).

The state circuit court adjudicated Petitioner's claim as follows:

Standard

Following the test set out by the U.S. Supreme court in Strickland v. Washington, 466 U.S. 668 (1984), the Florida Supreme Court has held that there are two requirements for sufficiently alleging a claim of ineffective assistance of counsel:

First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of

the test when it is clear that the prejudice component is not
satisfied.

Ferrell v. State, 29 So. 3d 959, 969 (Fla. 2010) (quoting Maxwell v.
Wainwright, 490 So. 2d 927, 932 (Fla. 1986)).

As to the first prong, the defendant must show that trial counsel
"made errors so serious that trial counsel was not functioning as the
counsel guaranteed the defendant by the Sixth Amendment." Spann v.
State, 985 So. 2d 1059, 1064 (Fla. 2008). Counsel's performance is
ineffective if it falls below an objective standard of reasonableness based
on prevailing professional norms. See Cherry v. State, 781 So. 2d 1040
(Fla. 2000). The defendant is not entitled to perfect or error-free
counsel, only reasonably effective counsel. See Yarbrough v. State, 871
So. 2d 1026, 1030 (Fla. 1st DCA 2004) (quoting Waterhouse v. State,
522 So. 2d 341, 343 (Fla. 1988)). Furthermore, there is a strong
presumption that counsel's actions fell within the wide range of
reasonable professional assistance. See Johnston v. State, 63 So. 3d 730,
737 (Fla. 2011) (citing Strickland, 466 U.S. at 690.) The evaluation of
counsel's performance must be conducted in a manner that eliminates the
"distorting effects of hindsight" and considers the conduct in light of the
circumstances facing the attorney at the time. Johnston, 63 So. 3d at
737.

For the second prong, the court must determine whether there is
a reasonable probability that, but for the deficiency, the result of the
proceeding would have been different. See Franqui v. State, 59 So. 3d
82, 95 (Fla. 2011). "A reasonable probability is a probability sufficient
to undermine confidence in the outcome." Strickland, 466 U.S. at 694.
The defendant bears the burden of establishing both deficient
performance on the part of counsel and prejudice to the defendant
resulting from that deficient performance in order to prevail on a claim
of ineffective assistance of counsel. Id. at 687; see also Waterhouse, 792
So. 2d at 1182 ("[B]ecause the Strickland standard requires the
establishment of both prongs, when a defendant fails to make a showing

as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.").

In determining whether a defendant has met Strickland's prejudice prong, Florida courts use the recently created Alcorn test. Alcorn v. State, 121 So. 3d 419, 422 (Fla. 2013). Both the U.S. Supreme Court and the Florida Supreme Court have recognized that plea negotiations are now "a 'critical point' in the course of a criminal proceeding" and, as such, require meticulous review to ensure that the defendant received his guaranteed Sixth Amendment right to effective assistance of counsel. Alcorn, 121 So. 3d at 427 (citing Missouri v. Frye, 132 S. Ct. 1399 (2012)). The U.S. Supreme Court has extended Strickland to apply to cases in which "defendants failed to accept a plea offer and then proceeded to trial as a result of their attorney's deficient performance." Alcorn, 121 So. 3d at 427 (emphasis omitted) (citing Frye. 132 S. Ct. at 1407–08; Lafler v. Cooper, 132 S. Ct. 1376 (2012)). Alcorn imposes upon defendants the burden of establishing "'a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.'" Alcorn, 121 So. 3d at 430 (quoting Frye, 132 S. Ct. at 1409). In doing so, the defendant must show that: (1) the defendant "would have accepted the offer had counsel advised the defendant correctly, (2) the prosecutor would not have withdrawn the offer, (3) the court would have accepted the offer, and ( 4) the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Alcorn, 121 So. 3d at 430 (citing Frye, 132 S. Ct. at 1410). Prejudice should be determined by considering the circumstances at the time of the offer, specifically what action the defendant would have taken had he be given "proper and adequate advice." Alcorn, 121 So. 3d at 432 (emphasis omitted).

## Analysis

In his first ground, the Defendant alleges that his counsel was ineffective due to his attorney's failure to adequately prepare him for his

pretrial hearing on November 21, 2012. The Defendant claims that his attorney had a duty to anticipate that a plea offer would be presented by the State at the pretrial hearing. The Defendant also claims that his attorney had a duty to instruct the Defendant to take his medication prior to the hearing so that he would be ready and capable of accepting any plea deal that may be offered. At that pretrial hearing, the State offered the Defendant a plea deal of seven (7) years in prison. However, the Defendant alleges that because he was not on his medication, he did not feel mentally capable of accepting a plea deal. The Defendant alleges that had his counsel instructed him to take his medication, there is a reasonable probability that he would have accepted the plea offer made by the State at the pretrial hearing.

Counsel owes no duty to exercise clairvoyant capabilities in order to anticipate the offering of a plea agreement. Neither does counsel owe a duty to act as a physician and direct a defendant to take prescribed medication. Rather, under <u>Alcorn</u>, counsel's only duty is to inform a Defendant of any plea deal that has been offered and explain the consequences of a defendant's decision to accept or reject a plea offer. Accordingly, the Defendant's first claim is without merit and is due to be denied.

(Ex. P at 35–37). Petitioner filed a motion for rehearing, in which argued that the circuit court overlooked his argument that defense counsel and the trial court were obligated under Rule 3.210 of the Florida Rules of Criminal Procedure to hold competency proceedings when it became apparent at the pre-trial hearing on November 21, 2012, that Petitioner was incompetent to proceed (*id.* at 72–83). The same day that Petitioner filed the motion for rehearing, he filed a notice of appeal of the circuit court's decision denying his Rule 3.850 motion (*id.* at 84–86). The circuit

court dismissed the motion for rehearing on the ground that Petitioner's filing of the notice of appeal was an abandonment of the motion for rehearing and divested the circuit court of jurisdiction to consider it (*id.* at 87).

Petitioner appealed the circuit court's decision to the First DCA (Ex. Q). In his initial brief, he argued that his constitutional rights to a fair trial were violated when the trial court and defense counsel allowed Petitioner to proceed to trial even though there was a reasonable basis to question his competency at the pre-trial hearing (*id.*). The First DCA affirmed the circuit court's denial of the Rule 3.850 motion without written explanation. Ho v. State, 169 So. 3d 1165 (Fla. 1st DCA 2015) (Table).

To the extent Petitioner's IATC claim is based upon defense counsel's failure to advise Petitioner to take his prescription medication in preparation for a potential plea offer at the pre-trial hearing on November 21, 2012, that claim was adjudicated on the merits in the Rule 3.850 proceedings in the state circuit court and the First DCA. The state courts did not unreasonably apply Strickland in concluding that defense counsel's failure to remind Petitioner to take his prescribed medication prior to coming to court did not constitute deficient performance.

Additionally, Petitioner's claim that defense counsel and the trial court violated his due process rights by failing to initiate proceedings to determine his competency,

upon learning that Petitioner failed to take his medication on November 21, 2012, is without merit notwithstanding Petitioner's failure to present this claim to the state courts in a procedurally proper context in which the state courts could properly adjudicate the merits. The Due Process Clause of the Fourteenth Amendment prohibits the State from trying or convicting a defendant who is mentally incompetent. *See* Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). The Supreme Court set the standard to be used in determining mental competency as whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed 2d 824 (1960) (per curiam); Drope v. Missouri, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *see also* Indiana v. Edwards, 554 U.S. 164, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008). Florida courts follow this standard. *See* Hernandez-Alberto v. State, 126 So. 3d 193, 209 (Fla. 2013) (citing Dusky, 362 U.S. at 402; Drope, 420 U.S. at 171).

In Drope, the Court elaborated as follows:

> The import of our decision in Pate v. Robinson is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of

these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

Drope, 420 U.S. at 180.

The Eleventh Circuit has applied and expounded upon these standards. "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995) (citation omitted). A petitioner who makes a substantive competency claim, contending he was convicted while mentally incompetent, "is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." James v. Singletary, 957 F.2d 1562, 1571 (11th Cir. 1992). A petitioner who presents "clear and convincing evidence" which creates a "real, substantial and legitimate doubt" as to her competence is entitled to an evidentiary hearing on her substantive competency claim. Medina, 59 F.3d at 1106 (quoting James, 957 F.2d at 1573). However, the standard of proof is high, and "the facts must positively, unequivocally, and clearly generate the legitimate doubt." Card v. Singletary, 981 F.2d 481, 484 (11th Cir. 1992)

(quotations omitted).  Relevant information may include evidence of a defendant's irrational behavior, demeanor at trial, or prior medical opinion.  *See* <u>Watts v. Singletary</u>, 87 F.3d 1282, 1287 (11th Cir. 1996).

A lifelong history of mental illness and emotional problems does not demonstrate incompetency without a specific showing of how these difficulties generated a substantial doubt as to the defendant's competency at the time in question. *See* <u>Medina</u>, 59 F.3d at 1106; <u>Card</u>, 981 F.2d at 484.  Similarly, the fact that the accused is undergoing treatment with psychiatric drugs, while relevant, does not alone prove incompetence.  *See* <u>Sheley v. Singletary</u>, 955 F.2d 1434, 1438–39 (11th Cir. 1992).  In order to establish incompetence, evidence must establish that the drugs affected the accused to the point that he could not effectively consult with his attorney and could not understand the proceedings.  *See id.* at 1439.

The Florida Rules of Criminal Procedure relevant to a defendant's competency provide:

> **(a) Proceedings Barred during Incompetency.**  A person accused of an offense or a violation of probation or community control who is mentally incompetent to proceed at any material stage of a criminal proceeding shall not be proceeded against while incompetent.
> . . . .
> **(b) Motion for Examination.**  If, at any material stage of a criminal proceeding, the court of its own motion, or on motion of counsel for the defendant or for the state, has reasonable ground to believe that the

> defendant is not mentally competent to proceed, the court shall immediately enter its order setting a time for a hearing to determine the defendant's mental condition, which shall be held no later than 20 days after the date of the filing of the motion, and may order the defendant to be examined by no more than 3 experts, as needed, prior to the date of the hearing.
>
> . . . .
>
> (1) A written motion for the examination made by counsel for the defendant shall contain a certificate of counsel that the motion is made in good faith and on reasonable grounds to believe that the defendant is incompetent to proceed. To the extent that it does not invade the lawyer-client privilege, the motion shall contain a recital of the specific observations of and conversations with the defendant that have formed the basis for the motion.

Fla. R. Crim. P. 3.210(a)–(b).

As previously noted, on two occasions during the pendency of Petitioner's criminal proceedings, the trial court issued orders, on December 21, 2011 and April 20, 2012, concluding that Petitioner was incompetent to proceed due to his mental illness, based upon the reports of competency evaluators (Ex. C at 263–66, 282–85). On August 9, 2012, the court was advised that Petitioner no longer met the criteria for pre-trial commitment to the facility in which Petitioner was being treated for his mental illness; therefore, the court set the matter for a hearing on August 20, 2012 (*id.* at 287–88). Following the hearing, the court determined that Petitioner was competent to proceed. The court's determination was based upon the report of Dr. May Tay, who recommended the following:

1.      Return Mr. Ho to Bay County for a judicial determination of competency to proceed.

2.      Continued mental health treatment is recommended while Mr. Ho is detained prior to the disposition of his pending charges. An aftercare form will accompany Mr. Ho upon his discharge to detail to jail medical officials his current medication regimen and treatment needs. Appropriate measures should be taken to ensure continuation of his psychotropic medication regimen and mental health supervision to pre-empt any genuine, if any, decompensation. Follow-up counseling in the jail by his assigned forensic case manager is recommended to assist Mr. Ho to deal with the stress of pre-trial detention and to address continuity of care issues.

3.      Mr. Ho is likely to present as highly symptomatic, with ostensible memory impairments, thought-disorder, and disorientation, while in the jail and particularly during any future court-ordered competency evaluations. It is recommended that the appointed community-based evaluator be furnished with a copy of this report prior to seeing Mr. Ho, and that individuals evaluating him maintain a high index of suspicion for malingering. Absent significant convincing evidence to the contrary, any acting out, medication refusal, refusal to respond to questions, severe confusion, and/or forgetfulness that Mr. Ho displays in the jail or in the courtroom should be considered willful, volitional, and deceptive.

4.      Continued supervision, medication compliance, and abstinence from illicit substances are recommended wherever Mr. Ho is placed following disposition of his charges.

(Ex. S-1).

Petitioner contends the trial court and defense counsel were aware of the

evaluator's recommendation that Petitioner maintain his medication regimen, and the

court and counsel's awareness that Petitioner had not taken is prescription medication

on the morning of November 21, 2012, presented reasonable grounds for defense counsel or the court to initiate the competency procedure set forth in Rule 3.120.

The transcript of the November 21, 2012 hearing is part of the record (Ex. S-3). At the hearing, the trial court announced that Petitioner's case was on the trial calendar for January of 2013, and that it would be placed on the December calendar for a trial management conference unless the parties indicated otherwise (*id.*). Defense counsel announced, in Petitioner's presence, that the prosecutor "made a one-time offer today . . . of seven years Department of Corrections." (*id.*). Defense counsel continued:

> MR. CARLISLE [defense counsel]: Mr. Ho feels that he is not mentally stable enough right now, without taking his medication this morning, to accept that much time. The State is not willing to extend the offer. I just want to get that on the record.

> THE COURT: All right. Then what I'm going to do is put it on the trial management for December 21st, trial management.

> MR. CARLISLE: Yes, sir.

> THE DEFENDANT: Because I stayed up all night, so I don't think it's, I'm not thinking right.

> THE COURT: December 21st trial management, okay.

(Ex. S-3).

The fact that Petitioner had not taken his medication on one particular day did not provide a reasonable ground to believe that Petitioner was not mentally competent to proceed. This is especially true since the court and the parties were aware that Dr. Tay had recommended, "Absent significant convincing evidence to the contrary, any acting out, medication refusal, refusal to respond to questions, severe confusion, and/or forgetfulness that Mr. Ho displays in the jail or in the courtroom should be considered willful, volitional, and deceptive."

Further, Petitioner has offered nothing, except perhaps his own speculation, showing that he would have been determined incompetent had counsel objected to Petitioner's proceeding to trial without the appointment of an additional expert, competency evaluation, and competency hearing. Therefore, Petitioner failed to show that the result of the proceedings would have been different if counsel had invoked the Rule 3.120 procedure at the November 21, 2012 hearing.

Petitioner failed to establish that defense counsel provided ineffective assistance at the pre-trial hearing on November 21, 2012. Therefore, Petitioner is not entitled to federal habeas relief on Ground Three.

D. <u>Ground Four: "Ineffective assistance of counsel regarding jury instructions not given but required under Fla. R. Crim. P. Rule 3.215(c)(2) in violation of U.S. Const. Ammend. [sic] VI."</u>

Petitioner claims that defense counsel was ineffective for failing to make a motion for a jury instruction regarding Petitioner's reliance upon prescribed psychotropic medications, pursuant to Rule 3.215(c)(2) of the Florida Rules of Criminal Procedure (ECF No. 1 at 10; ECF No. 22 at 13–17; ECF No. 25 at 9–10). Petitioner states he presented this claim to the state courts in a Rule 3.850 motion, which the circuit court dismissed as successive on September 16, 2015 (*see* ECF No. 1 at 10–11).  Petitioner states he appealed the dismissal to the First DCA, and the appellate court affirmed the lower court's decision (*id.*).

Respondent argues Petitioner is procedurally barred from pursing this IATC claim in federal court because he attempted to present it to the state courts in a manner not permitted by state procedural rules (i.e., a successive Rule 3.850 motion) (ECF No. 24 at 11–13).  Respondent further argues that, notwithstanding the procedural bar, the claim is without merit (*id.* at 13–14).

Petitioner argues that if this court determines that he procedurally defaulted Ground Four, he can establish "cause" for the procedural default based upon his mental illness and incompetence (ECF No. 30-1 at 11–15).

Petitioner presented this IATC claim as Ground 1 of the Rule 3.850 motion filed on September 1, 2015 (Ex. J at 1–12). The state court dismissed the Rule 3.850 motion on the following grounds:

> The Defendant's Motion is due to be dismissed as successive because there is no good cause for the Defendant to have failed to raise these claims in his original Motion. <u>See</u> Fla. R. Crim. P. 3.850(h)(2); <u>Morris v. State</u>, 134 So. 3d 1066, 1067–1068 (Fla. 4th DCA 2013) (holding that when filing a successive motion for postconviction relief, "[t]he burden is on the movant to show extraordinary circumstances and good cause for having failed to raise the 'new' claim in the prior motion"). Although the Defendant asserts that his present claims are based on "new evidence," he has failed to demonstrate that his claims are based upon facts that neither he, counsel, nor the court knew or could have known at the time of trial. <u>See</u> <u>Jones v. State</u>, 591 So. 2d 911 (Fla. 1991). The fact that the jury was not informed of the Defendant's reliance on prescribed psychotropic medication is simply not newly discovered evidence. Therefore, the Defendant's Motion is due to be dismissed.

(Ex. J at 45–47). The First DCA affirmed the decision without written explanation (*see* Exs. K, L).

The state courts' ruling—that Petitioner's claim was successive and procedurally barred—constitutes an independent and adequate state law ground for denial that procedurally bars the claims from federal habeas review. The state court clearly and expressly stated it was relying on state procedural rules to resolve the federal claim. Further, the state court's decision on the procedural issue rested

entirely on state law grounds and was not intertwined with an interpretation of federal law. Additionally, the rule that successive Rule 3.850 motions are generally prohibited when the grounds alleged therein were known or could have been known at the time of the first Rule 3.850 motion, is firmly established and consistently followed by the Florida courts. *See* Baker v. State, 878 So. 2d 1236, 1243–44 (Fla. 2004); Fla. R. Crim. P. 3.850(h) (formerly Rule 3.850(f)); Christopher v. State, 489 So. 2d 22, 24 (Fla. 1986); Frazier v. State, 898 So. 2d 1183, 1183–84 (Fla. 3d DCA 2005) (barring as successive claims that could have and should have been made in previous post-conviction motion); Washington v. State, 876 So. 2d 1233, 1234 (Fla. 5th DCA 2004) (same).

Petitioner argues that the failure to present his IATC in his first Rule 3.850 motion was caused by his mental illness and incompetence. However, the record demonstrates that Petitioner was mentally able to research, discover, articulate, analyze, and argue other IATC claims in his first Rule 3.850 motion (for example, the IATC claim presented as Ground Three of the instant 2254 petition). Therefore, Petitioner failed to demonstrate that his mental condition caused the procedural default of the IATC claim presented in Ground Four. Petitioner has not shown he is entitled

to a merits review of Ground Four through any recognized exception to the procedural bar. Therefore, federal habeas relief should be denied.

## V.     CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" Buck v. Davis, 580 U.S.—, 137 S. Ct. 773 (2017) (citing Miller-El, 537 U.S. at 327). The petitioner here cannot make that

showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

Petitioner's motions to supplement (ECF Nos. 26, 30) are **GRANTED**.

And it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 15<u>th</u> day of August 2017.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use</u>**

**only, and does not control.  A copy of objections shall be served upon all other parties.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**